# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS AUSTIN DIVISION

| | | |
|---|---|---|
| **GREGORY RAYMOND KELLEY,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 1:20-CV-481-RP** |
| **CITY OF CEDAR PARK, SEAN** | § | |
| **MANNIX, and CHRISTOPHER** | § | |
| **DAILEY,** | § | |
| *Defendants* | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE ROBERT PITMAN**
**    UNITED STATES DISTRICT JUDGE**

Before the Court are Defendant City of Cedar Park's Motion to Dismiss Plaintiff's Second Amended Complaint, filed March 12, 2021 (Dkt. 38); Defendants Sean Mannix and Christopher Dailey's Partial Motion to Dismiss Plaintiff's Second Amended Complaint and Supporting Brief, filed March 12, 2021 (Dkt. 39); and the parties' response, reply, and sur-reply briefs.[1]

## I.    Procedural History

On July 15, 2014, Plaintiff Gregory Kelley, then 18 years old, was convicted of two counts of aggravated sexual assault of a child under the age of six. *State v. Kelley*, No. 13-1367-K26 (26th Dist. Ct., Williamson County, Tex. July 15, 2014). After the guilty verdict, on the advice of counsel, Kelley entered into a plea agreement in which he waived his right to appeal his sentence in exchange for serving the mandatory minimum sentence of 25 years imprisonment in the Texas

---

[1] On January 4, 2022, the District Court referred the motions to the undersigned Magistrate Judge for Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Dkt. 61. The Court granted Plaintiff's motions for leave to file sur-reply briefs on January 14, 2022.

Department of Corrections. Kelley filed three separate motions for new trial, all of which were denied by the trial court and affirmed by the Texas Third Court of Appeals. *Kelley v. State*, No. 03-14-00622-CR, 2016 WL 612932, at *1 (Tex. App.—Austin, Feb. 11, 2016, pet. denied).

Kelley served three years in prison. On March 6, 2017, he filed an Application for Writ of Habeas Corpus (the "Writ") pursuant to Article 11.07 of the Texas Code of Criminal Procedure, arguing that his case should be overturned because (1) he was actually innocent of the charges and there was insufficient evidence for a reasonable jury to convict him; (2) his due process rights were violated by reckless and bad-faith police misconduct, failure to investigate other suspects, and the suppression of exculpatory evidence; and (3) he had been denied the effective assistance of counsel. *Ex Parte Kelley*, No. 13-1367-K26-A (26th Dist. Ct., Williamson County, Tex. Mar. 6, 2017).[2]

The Habeas Court received evidence and conducted an evidentiary hearing on Kelley's Writ on August 2-3, 2017. Corrected Findings of Fact and Conclusions of Law ("FFCL"), Dkt. 65-1 (filed under seal). After the hearing, Kelley and the State jointly stipulated to Findings of Fact and Conclusions of Law with regard to Kelley's bad faith and police misconduct claim and aspects of his ineffective assistance of counsel claim. *Id.* at 2. On August 22, 2017, the Habeas Court approved the Joint Stipulation and ordered Kelley released on bond pending final resolution of his Writ. *Id.* The Habeas Court continued to receive evidence after Kelley was released.

The Habeas Court issued its Corrected Findings of Fact and Conclusions of Law on December 18, 2017, recommending that Kelley's claim of actual innocence be granted and that his conviction be set aside. The Habeas Court reasoned that: "After weighing the extreme

---

[2] The Court takes judicial notice of the docket and state court records filed in Kelley's state criminal and habeas proceedings. *See Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995) ("Federal courts are permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss."); *Landry v. Lynaugh*, 844 F.2d 1122, 1124 n.8 (5th Cir. 1988) (taking judicial notice of state court trial records).

weakness of the State's circumstantial case against the newly discovered evidence identified herein, this Court concludes that no reasonable jury could have found the Applicant guilty. . . . He has met his burden and established he is actually innocent of the offense for which he was convicted." FFCL at 33. The Habeas Court alternatively recommended that Kelley's due process claim related to the deficient police investigation and his ineffective assistance of counsel claim be granted. *Id.*

The Texas Court of Criminal Appeals granted Kelley's Application for Writ of Habeas Corpus on November 6, 2019. *Ex parte Kelley*, No. WR-87,470-01, 2019 WL 5788034 (Tex. Crim. App. Nov. 6, 2019) (per curiam). In its brief opinion, the Court of Criminal Appeals stated:

> Applicant alleges, among other things, that he is actually innocent of committing the offense in this case. The State agrees that he is entitled to relief.
> The trial court, after holding a live evidentiary hearing, recommends relief be granted. We agree. Applicant is entitled to relief.
> Relief is granted. The judgment in Cause No. 13-1367-K26 in the 26th District Court of Williamson County is set aside, and Applicant is remanded to the custody of the Sheriff of Williamson County to answer the charges as set out in the indictment. The trial court shall issue any necessary bench warrant within 10 days after the mandate of this Court issues.

*Id.* at *1 (citation omitted). The trial court dismissed all charges against Kelley on November 27, 2019.

On May 5, 2020, Kelley filed this action under 42 U.S.C. § 1983 against the City of Cedar Park (the "City"); Sean Mannix, Chief of Police of the Cedar Park Police Department ("CPPD") at the time of Kelley's arrest and prosecution; and CPPD Detective Christopher Dailey, who investigated Kelley's case.[3] In his Second Amended Complaint, Kelley asserts constitutional claims under the Fourth, Fifth, and Fourteenth Amendments, a Section 1983 conspiracy claim, and

---

[3] Mannix and Dailey resigned from the CPPD after Kelley's habeas proceedings.

a defamation claim against Mannix. Kelley seeks compensatory damages, punitive damages against Mannix, and attorney's fees and costs. The City moves to dismiss all of Kelley's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted; Mannix and Dailey move to dismiss most of Kelley's claims for failure to state a claim.

Before addressing Defendants' arguments for dismissal, the Court provides a brief summary of the relevant facts concerning Kelley's state criminal trial, his habeas proceedings, and the allegations asserted in his Second Amended Complaint.

## II.    Factual Background

### A.  Kelley Moves in with Johnathan McCarty

In the fall of 2012, Kelley was a 17-year-old junior at Leander High School who played on the school's football team, the Leander Lyons. In addition to earning "all-district honors," Kelley was recruited to play college football. Second Am. Compl. (Dkt. 37) ¶¶ 21-22. Local media "followed and reported on his game performances, his athletic skills and the brightness of his future prospects." *Id.* ¶ 22.

Despite Kelley's success on the football field, his parents suffered from severe medical problems and were unable to take care of him.[4] *Id.* ¶ 21. Accordingly, in December 2012, Kelley temporarily moved in with his friend and teammate Johnathan McCarty. *Id.* Johnathan lived with his parents, Shama and Ralph McCarty, in Cedar Park, Texas. *Id.* ¶¶ 19-20. Nimesh Dissanayaka, Johnathan's older half-brother, and Johnathan's friend and teammate Angel Perez also were living at the McCarty house. *Id.* 37 ¶ 20. Shama McCarty testified that she invited Kelley to stay with her family "because she wanted to help his family and to make it easier for him to continue with the Leander High varsity football program." *Id.* ¶ 21.

---

[4] Plaintiff's father had suffered a stroke and his mother had undergone three brain surgeries. Dkt. 37 ¶ 21.

After living at the McCarty house for a few months, Kelley moved out on June 11, 2013. FFCL at 9. Johnathan McCarty, Angel Perez, and Nimesh Dissanayaka continued to live at the McCarty house. *Id.* Numerous witnesses in Kelley's habeas proceedings testified that Kelley and Johnathan McCarty looked alike, had similar facial features, and sometimes were mistaken for each other. *Id.* at 10.

Shama McCarty also operated a day care business out of the McCarty house, supervising several young children. Dkt. 37 ¶ 20. Based on the trial testimony, the day care was not highly structured, and "kids would be all scattered out" in the house, sometimes napping in residents' bedrooms. *Ex parte Kelley*, 2019 WL 5788034, at *14 (Newell, J., concurring).[5] Parents of the children in day care also would come and go throughout the day, sometimes spending time at the McCarty house. Dkt. 37 ¶ 20. Witnesses described the McCarty house as "Grand Central Station" because of all the children in day care, their parents, and "Johnathan's friends coming in and out." *Ex parte Kelley*, 2019 WL 5788034, at *14.

## B. Outcries[6] and Investigation

In the summer of 2013, two children who attended day care at the McCarty house made outcries of sexual assault.

### 1. H.M.'s Outcry

H.M., then four years old, attended day care at the McCarty house in fall 2012 and spring 2013. On July 14, 2013—one month after Kelley moved out of the McCarty house—H.M., while using the bathroom at his home, told his mother that "I wish my pee-pee was big." FFCL at 5. H.M.'s

---

[5] Court of Criminal Appeals Judge David Newell issued a detailed concurring opinion summarizing many of the relevant facts at issue in the case before this Court.

[6] A child victim's out-of-court statement is commonly known as an "outcry," and an adult who testifies about the outcry is commonly known as an "outcry witness." *Sanchez v. State*, 354 S.W.3d 476, 484 (Tex. Crim. App. 2011).

mother asked why, and H.M. said, "I wish my pee-pee was big like Greg's." *Id.* When she asked

him how he knew the size of "Greg's" penis, H.M. said, "Because he made me stick it in my

mouth." *Id.* H.M. told his mother that it happened twice and that "Greg" also tried to lick H.M.'s

penis. *Id.* H.M.'s mother "assumed" that the "Greg" that H.M. had referred to was Kelley because

"the only Greg she knew was the defendant, Greg Kelley." *Id.* at 5-6. H.M.'s father further

questioned H.M. and said that H.M. told him substantially the same thing. *Id.* at 5. H.M.'s father

also assumed that his son was referring to Kelley because "he knew who Greg was and had seen

his son playing ball with Greg in the living room of the day care." *Id.*

On July 18, 2013, H.M.'s father called the CPPD to report that his son had been sexually

assaulted while he was at day care at the McCarty house and identified Kelley as the assailant.

Dkt. 37 ¶ 19. CPPD Officer Kevin Freed interviewed H.M.'s father and prepared an initial report.

H.M.'s father told Freed that "the offense likely occurred between July 8th and July 12th because

H.M. made his outcry on July 13th." *Ex parte Kelley*, 2019 WL 5788034, at *7. Accordingly,

Freed wrote in his initial report that the offense date was "July 12, 2013." FFCL at 16. Freed then

called the Williamson County Children's Advocacy Center to report the incident and advise them

that the offense likely occurred on July 12, 2013. *Id.*

Freed turned over the case to CPPD Detective Christopher Dailey. FFCL at 5. Freed asked

Dailey to interview H.M.'s father, but Dailey said that he "would interview him later." *Id.* Dailey

then called the Children's Advocacy Center to set up a forensic interview of H.M. *Id.* Jennifer

Deazvedo interviewed H.M. at the Center on July 23, 2013. *Id.* Deazvedo testified that she uses

open-ended questions to gather details from suspected child abuse victims. *Id.* Dailey and Heather

Bradley, an investigator with Texas Residential Child Care Licensing, observed the interview.

FFCL at 5; *Ex parte Kelley*, 2019 WL 5788034, at *5. During the interview, H.M. told Deazvedo

the following:

> "With Greg he's always putting his pee pee in my mouth." And,
> "Greg has a big pee pee than me." He said it happened "two times
> when I was sleeping at Mimi's[7] house . . . just two times." HM said
> he was sleeping in Greg's room "on the left side of his bed" when
> Greg woke him up the first time. Greg had "nighttime clothes" on,
> but HM could not describe them. Asked what direction Greg's pee
> pee was going, HM said, "To my mouth." Asked if it was sticking
> out from body or not, HM said, "Sticking out." HM said "it was just
> Greg and me" in the room.

*Ex parte Kelley*, 2019 WL 5788034, at *5. H.M. further told Deazvedo that:

> HM said that the second time it happened it was in "the couch room,
> it's the coach [sic], where sometimes I sleep . . . in the middle of the
> long couch but I was on the floor." HM said his mom came in and,
> "When he was doing it . . . when my mom saw it, my mom was
> going to fight him . . . my mom saw me and she saw Greg fighting
> me, and then my mom was fighting him." HM indicated that Greg
> "was punching me but that hurt." He indicated the punches struck
> his ribs. "I was crying and wanted my mom. Ms. Shama called my
> mom and my mom saw me crying and she fight [sic] Greg."

*Id.*

Based on H.M.'s accusations, Dailey concluded that Kelley was guilty and sought a warrant

for his arrest. Dailey did little to no investigation into H.M.'s accusations before determining

Kelley's guilt. For example, Dailey never asked H.M.'s parents about the boy's statements

regarding "Greg" and his fantastical statements regarding a fistfight between his mother and Greg.

*Id.* In fact, Dailey did not interview H.M.'s mother at all; she testified that she "personally ha[d]

not spoken to law enforcement" and "did not witness what her son said she witnessed." *Id.*

Dailey also did not ask H.M. to identify Kelley as the "Greg" who molested him before seeking

his arrest. FFCL at 6. Dailey did not show H.M. any photographs of Kelley or any other suspect

---

[7] Mimi is a nickname for Shama McCarty. *Ex parte Kelley*, 2019 WL 5788034, at *5 n.9.

for identification purposes. As the Habeas Court stated, "there is no evidence in the record that, at any time during the investigation, H.M. ever identified the person he referred to as 'Greg' as being the same person as Greg Kelley." *Id.*

Dailey also admitted that he never interviewed any of the male residents of the McCarty house at the time of the allegations (i.e., Ralph McCarty, Johnathan McCarty, Angel Perez, or Nimesh Dissanayaka). *Ex parte Kelley*, 2019 WL 5788034, at \*7. Dailey did not attempt to interview any of the other students and parents who were present at the house when day care children were there. *Id.* Nor did Dailey ever visit the McCarty house or examine the rooms where the alleged abuse took place. *Id.* Most egregiously, Dailey never interviewed Kelley before determining that he was the guilty party. Dailey said he attempted to contact Kelley "but did not get a phone call back." FFCL at 6. As revealed during his habeas proceedings, Kelley was not at the McCarty house on July 12, 2013, and had alibi evidence to prove it: Not only had Kelley moved out a month earlier, but he presented evidence that he was helping his brother move to Hutto, Texas that day. *Id.* at 10.

"[B]ecause Detective Dailey believed that HM was telling the truth, he conducted no further investigation, took the information he had to the district attorney's office, and, on August 7th, got a warrant for Applicant's arrest." *Ex parte Kelley*, 2019 WL 5788034, at \*5. On August 9, 2013, Kelley turned himself in. *Id.* Kelley alleges that because H.M.'s accusation "was presumed to be against a star player on Cedar Park High's arch-rival football team," Chief Mannix was immediately made aware of the accusations against him and "assumed control and directed the 'investigation.'" Dkt. 37 ¶ 27.

### 2. L.M.'s Outcry

Three days after Kelley was arrested, Dailey called the father of L.M., another four-year-old boy who had attended day care at the McCarty house. L.M.'s father told Dailey that he was concerned about his son because Kelley had once given L.M. an armband. *Ex parte Kelley*, 2019

WL 5788034, at *6. Dailey asked L.M.'s father to bring L.M. to the Children's Advocacy Center the next day to be interviewed. *Id.* Dailey later admitted that during this conversation, he "possibly" gave L.M.'s father "details of H.M.'s outcry." *Id.* at *7.

After Dailey's phone call, L.M.'s mother asked L.M. whether he missed[8] "Shama's house" and the "boys upstairs," and L.M. said "Yes." *Id.* L.M. further stated "They were our bosses . . . Mr. Greg and Mr. Johnathan." *Id.* L.M.'s mother asked him what he meant by that, and L.M. said "that Mr. Greg asked him to rub lotion on his tee-tee because it was old and it made it feel better." *Id.* Asked what he was saying, L.M. repeated himself. *Id.* L.M. then said, "Nevermind. Everything's okay. Nevermind. Nevermind," and "went back to doing his puzzle." *Id.* L.M.'s mother said that the only "Greg" that L.M. knew was Kelley, "and that no other Greg was associated with the daycare other than Greg Kelley." *Id.*

The next day, L.M. was interviewed at the Children's Advocacy Center by Mikey Betancourt. L.M. made no outcry during the interview. *Id.* A couple of weeks later, Deazvedo conducted another forensic interview of L.M. Again, L.M. made no outcry. *Id.* After Deazvedo walked out of the interview room, however, Dailey and Heather Bradley – who had been watching the interview from another room – decided to interview L.M. themselves. *Id.* Dailey said that he "felt more direct questions needed to be asked." *Id.* Dailey was dressed in plain clothes but had a gun holstered at his hip and identified himself as a police officer. *Id.* This time, L.M. made an outcry and alleged that both "Mr. Greg" and "Johnathan" were involved. Specifically, the following exchange took place:

> Q.  Your momma told me that Johnathan had a friend by the name of Mr. Greg?
> A.  (Nods) "I went to school."

---

[8] By this time, L.M. was attending a different day care facility.

Q.  Your Momma told me that you said that Mr. Greg was the boss of you, and that Mr. Greg got lotion and put lotion on his pee-pee; is that true?

A.  (Shakes head).

Q.  Did Mr. Johnathan do that?

A.  No.

Q.  Then why'd you tell you mom?

A.  No, I told my dad.

Q.  Why?

A.  In the bathroom. Because I was going pee-pee and telling him.

Q.  Was it Mr. Greg that gave you the lotion or Mr. Johnathan?

A.  Mr. Johnathan.

Q.  Mr. Johnathan gave you the lotion?

A.  (Nods).

Q.  And did you put the lotion on Mr. Greg's pee-pee or Johnathan's?

A.  Mr. Greg's pee-pee.

Q.  Did Mr. Greg have you put lotion on his pee-pee one time or more than one time?

A.  One time.

*Id.* at *6 n.13. Dailey later admitted that he "didn't attempt to build rapport" with L.M., was not a "trained forensic interviewer," and had asked L.M. leading questions. *Id.* at *6. Dailey later told Bradley that he knew there were problems with the way he interviewed L.M., but that it "would help with [H.M.'s] case." *Id.*

Dailey never attempted to interview Kelley about L.M.'s accusations. *Id.* Dailey also never attempted to interview Johnathan McCarty; nor did he perform any follow up investigation into Johnathan McCarty's involvement with L.M. Once again, Dailey also never interviewed any of the other male residents at the McCarty house. *Id.*

Dailey later admitted that, against CPPD policy, he deleted several emails he had received from Bradley regarding the interview of another child at the McCarty day care, attempts to talk to the prosecutor and re-interview L.M., and "getting a warrant and having Greg arrested." *Ex parte*

10

*Kelley*, 2019 WL 5788034, at *7. Bradley deleted the same emails, against her workplace policy. *Id.* Dailey's 13-page offense report "[c]onspicuously" failed to mention L.M.'s claim that Kelley attacked him in the presence of L.M.'s mother. *Id.* at *8.

### C. Indictment and Arrest

Kelley's Reindictment on May 20, 2014, which was presented to the jury, contained an offense date of "April 15, 2013." Writ Dkt.[9] at 2616. Dailey admitted that he had backdated the offense to a time when Kelley was living at the McCarty house. *Ex parte Kelley*, 2019 WL 5788034, at*7. As noted, H.M.'s father told Officer Freed that H.M. likely was sexually assaulted on July 12, 2013. Freed put this offense date in his initial offense report. But Kelley had moved out of the McCarty house on June 11, 2013. Dailey backdated the offense date range in his probable cause affidavits supporting Kelley's arrest warrants to "[b]etween December 2012 and June 2013." Dkt. 49-1, 49-2. "Detective Dailey later testified he chose the six-month date range because that was the period that Greg Kelley lived with the McCarty family." Dkt. 37 ¶ 29.

A few days after Kelley's second arrest, Mannix held a press conference to announce the arrest. Dkt. 37 ¶ 48. Mannix stated that he believed Kelley was guilty of the charges, adding that "I do not believe there is a cabal of four-year-olds out there making up stories about this gentleman." *Id.* ¶¶ 48-49. Mannix further stated that he believed more children would come forward to accuse Kelley and encouraged "any parents who may have granted unsupervised access to their child to Mr. Kelley to come forward." *Id.*

Kelley alleges that Mannix continued to make comments to the media regarding his guilt, including: "No evidence of Kelley's innocence has ever been brought forward by him."; "No other suspects were sought and the investigation stayed focused on Greg Kelley because that is how a

---

[9] The "Writ Dkt." refers to Kelley's Habeas docket before the CCA, Case No. 13-1571-K26 (Writ No. 87, 470-01) at https://search.txcourts.gov/CaseSearch.aspx?coa=coscca&s=c.

proper investigation is conducted in all cases."; and "He is as innocent as O.J. Simpson is because the law says so." *Id.* ¶ 55.

## D.  Defense Counsel

At trial, Kelley was represented by Patricia Cummings and Marjorie Bachman. Shama McCarty, who had a "friendly" and "close" relationship with Cummings, referred Kelley to her. FFCL at 22. Cummings previously represented Shama McCarty's son, Nimesh Dissanayaka, in both adult criminal and juvenile proceedings, which included allegations that he had engaged in delinquent conduct by committing two instances of public lewdness and one instance of indecent exposure. *Id.* Cummings also had represented two of Shama McCarty's other sons, Manusha and Dinusha Dissanayaka, in connection with other criminal prosecutions. *Id.*

Cummings' sole defense theory at trial was that H.M. and L.M.'s accusations were false. *Id.* at 24. Cummings decided that "it was not in Greg's best interest" to try the case on a theory that someone else committed the crimes. *Id.* The Habeas Court disagreed, finding that "at the time of her representation of Applicant, trial counsel had knowledge of Nimesh Dissanayaka's prior criminal history for a sex-related adjudication, which would have been relevant to a potential alternative perpetrator defensive strategy." *Id.*

The Habeas Court further found that Cummings failed to acknowledge the numerous "red flags" readily apparent at the onset of the representation. *Id.* For example, Cummings ignored "the fact that the offense allegedly occurred in the McCarty home over a span of time when McCarty lived in the home and other family members also had access to the children in the daycare," and that "the nature of the allegation was consistent with the nature of at least one of the matters in which there was a prior representation of a McCarty family member by counsel." *Id.* The Habeas Court found that Cummings failed to fully inform her co-counsel or Kelley of the number and

nature of her prior representations of the McCarty family. *Id.* Kelley testified that "had he been fully advised of her prior dealings with the family he would not have hired her." *Id.*

The Habeas Court found that the pursuit of an alternate suspect theory would have meant suggesting to the jury that one of Cummings' former clients could have been the perpetrator. *Id.* at 27. Thus, the Habeas Court concluded:

> In the absence of a plausible explanation for counsel's failure to pursue an alternative suspect defense in light of her experience, the Court finds that counsel labored under an actual conflict of interest due to her affiliation with the McCarty family and counsel's prior representation of a potential alternative suspect in the sexual assault of H.M. But for counsel's deficient performance the outcome of the trial on guilt/innocence would have been different.

*Id.*

## E.  Trial

Kelley was charged with two counts of super aggravated sexual assault against H.M. and one count of indecency with a child by contact against L.M. Writ Dkt. at 2615-18. Kelley pled not guilty to all counts and the case proceeded to trial on July 7, 2014. H.M. and L.M.'s parents testified as to the boys' outcries.[10] H.M.'s mother testified that: "The one time I was there to get [H.M.] when he fell asleep, it looked like a trophy room," which she specified concerned "'wrestling trophies.'" FFCL at 11.[11]

---

[10] Article 38.072 of the Texas Code of Criminal Procedure, also known as the "outcry statute," creates a hearsay exception in the prosecution of certain sexual offenses committed against children for the admission of a child's first outcry of sexual abuse to an adult. *Bays v. State*, 396 S.W.3d 580, 581 n.1 (Tex. Crim. App. 2013).

[11] Photographs of Johnathan McCarty's room presented at the Habeas proceedings show that his room contained trophies, a couch, and a crib. FFCL at 11.

H.M. and L.M. also testified during the trial but from another room, and their testimony was shown to the jury, as permitted by Texas law.[12] H.M. testified that, "while he was taking his nap on the upstairs couch, and where the babies sleep, 'Greg' took down his Sponge Bob pajamas and put his pee-pee in his mouth twice," that "(Greg) put lotion on his (Greg's) dark-brown penis before inserting it into his mouth the second time," and "that the person who assaulted him wore SpongeBob pajamas." FFCL at 5, 11 (internal citations omitted). As the Habeas Court noted, "H.M. failed to make an in-person identification of Kelley either at or before trial, as required by section 9, article 38.071 of the Texas Code of Criminal Procedure." *Id.* at 6.[13] H.M. did not testify that the person he referred to as "Greg" was the same person as Greg Kelley. *Id.*

On the stand, L.M. "denied anything happened to him." *Ex parte Kelley*, 2019 WL 5788034, at *12. Although L.M. testified that he sometimes took naps "in Greg's bed," he denied

> that Greg ever touched him or showed him lotion; that he had ever told people that Greg had showed him lotion; that he ever did anything in bed with Greg; that he ever saw any part of Greg's body; that he showed Greg any part of his body; that he ever told anybody he saw parts of Greg's body; and that he'd ever told his parents about Greg.

*Id.* Eventually, L.M. testified that he knew neither "Johnathan" nor "Greg." *Id.* After he was shown a photo of the McCarty backyard and playscape, L.M. first testified that he "didn't know it," then that "he did know it," then said the house was "in Florida." *Id.* Asked who he slept with when he slept in Greg's bed, L.M. said: "I just slept by myself." *Id.* at *13. L.M. was shown a photo of Kelley "and identified the photo as being the 'Greg' that's 'been at Mimi's house awhile.'" *Id.*

---

[12] Article 38.071 of the Texas Code of Criminal Procedure allows a court under certain circumstances to "order that the testimony of the child be taken in a room other than the courtroom and be televised by closed circuit equipment in the courtroom to be viewed by the court and the finder of fact."

[13] The statute requires a child testifying pursuant to Section 3 to "make an in-person identification of the defendant either at or before the hearing or proceeding" when the identity of the perpetrator is a contested issue. FFCL at 28.

Kelley took the stand and denied committing the offenses. *Id.* at 14. Kelley outlined his tight schedule, which included school, football and track practices, work at part-time jobs, and lifting weights. *Id.* Kelley acknowledged knowing H.M. and L.M., but denied that he ever was alone with either of them. *Id.* He agreed that the McCarty house was like "Grand Central Station" after school with all the kids and "Johnathan's friends coming in and out." *Id.*

Kelley's defense counsel also put on the stand several character witnesses. The State presented rebuttal testimony from a manager of an Anytime Fitness Club that Kelley had lied to him by representing himself as a Marine. *Id.* at 15.

Both parties offered testimony from forensic psychologists, who gave opinions based on a hypothetical first child (H.M.) and a hypothetical second child (L.M.). *Id.* at 13. The State's expert, Dr. Lee Carter, deemed H.M.'s outcry to his mother reliable, but opined that L.M.'s outcry was provoked twice, after two denials at the Children's Advocacy Center. *Id.* "And if you were to call me and say 'I want you to consult with me on a case and here are the facts,' I would say 'Well, it's not a very good case.'" *Id.* In L.M.'s case, the State's expert testified that "we don't have a good idea of what happened to him." *Id.*

On July 15, 2014, the jury returned its verdict, finding Kelley guilty of two counts of super aggravated sexual assault against H.M. and not guilty of indecency with a child by contact as to to L.M. Writ Dkt. 2625-27. A juror later testified at Kelley's habeas proceedings that "[t]he failure to present an alternative suspect or alternative scenario is what convicted him." FFCL at 26.

## F.  Evidence Presented During Writ Proceedings

After Kelley filed his Writ in March 2017, the Williamson County District Attorney's Office hired an outside investigator, Texas Ranger Cody Mitchell, to investigate the allegations raised in the Writ. FFCL at 7. Mitchell spent "hundreds of hours" investigating the case. *Id.* He concluded that "the Cedar Park Police Department failed to perform many basic steps necessary to conduct

an effective investigation of this type of offense," and that "it was his professional opinion that the investigation of Applicant by the Cedar Park Police Department was not adequate." *Id.* Mitchell testified that there were numerous deficiencies in the CPPD investigation of Kelley, including "contamination between the two victims" and backdating of the offense date "to fit a time frame where [Kelley] was still living in the house" because Kelley was "their suspect." *Id.* at 17. Mitchell further testified that his investigation showed there were two other suspects who were living in the McCarty house at the time of the allegations "who may have committed the crime" for which Kelley was convicted: Johnathan McCarty and Nimesh Dissanayaka. *Id.* at 22. Indeed, much of the post-conviction evidence pointed toward Johnathan McCarty as the assailant.[14]

In addition, Judge Stacey Mathews of the 277th District Court of Williamson County testified that while she was still an assistant district attorney, she had a conversation with Dailey about L.M.'s accusations before Dailey filed his probable cause affidavit for Kelley's second arrest warrant. Judge Mathews testified that after she heard that L.M. had not made an outcry during two interviews at the Children's Advocacy Center, she advised Dailey to consult Assistant District Attorney Geoffrey Puryear "to obtain suggestions for further investigation." *Id.* at 16. Dailey denied that he ever discussed the case with Judge Mathews. *Id.* at 17. The Habeas Court found that Dailey's testimony was "unreliable" and that Dailey "disregarded Mathew's recommendation and arrested Applicant for the offense to have been committed against L.M. that day." *Id.* After Kelley field his Writ, the Cedar Park mayor and a member of the city council asked the Williamson County District Attorney's Office to open a perjury investigation into Dailey's testimony. Dkt. 37 ¶ 81.

---

[14] For example, numerous witnesses testified that after Kelley was convicted, Johnathan McCarty confessed to them that he was the one who had molested H.M., and photographs of his room were consistent with the boys' description of "Greg's" room. *See, e.g.*, FFCL at 6-7, 11.

### III.     This Lawsuit

Pursuant to 42 U.S.C. § 1983, Kelley alleges that the City, and Mannix and Dailey, in their individual and official capacities, violated his Fourth, Fifth, and Fourteenth Amendment rights under the United States Constitution by (1) fraudulently investigating and unlawfully seizing Kelley by arrest, detention, prosecution, conviction, and incarceration; (2) withholding and/or destroying material exculpatory evidence; (3) fabricating inculpatory evidence; (4) deliberately failing to pursue known and exculpatory investigatory leads; and (5) participating in a conspiracy to violate Kelley's Fourth, Fifth and Fourteenth Amendment rights. Kelley also asserts a separate claim against the City for failing to train or supervise its police officers in the investigation of Kelley. Dkt. 37 ¶ 4. Kelley also asserts that Mannix defamed him. *Id.* ¶ 171. As stated, the City moves to dismiss all, and Mannix and Dailey move to dismiss most, of Kelley's claims under Rule 12(b)(6).

### IV.     Legal Standards

**A.  Section 1983**

Section 1983 liability results when a "person" acting "under color of" state law deprives another of rights "secured by the Constitution" or federal law. 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979). Thus, the plaintiff must identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91(1978), the Supreme Court held that municipalities may be sued under Section 1983 but cannot be held liable for acts

of their employees under a theory of *respondeat superior*. Rather, to state a claim against a municipality under *Monell* and its progeny, a plaintiff must plead that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395 (5th Cir. 2017).

## B. Qualified Immunity

A government official sued under Section 1983 may raise the affirmative defense of qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The doctrine of qualified immunity was created to insulate government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations omitted).

When a defendant raises a qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the inapplicability of that defense. *Terwilliger v. Reyna*, 4 F.4th 270, 284 (5th Cir. 2021). To discharge this burden at the motion to dismiss stage, the plaintiff must allege sufficient facts (1) that the defendant violated a constitutional right, and (2) that the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. Courts have discretion to decide which prong of the qualified immunity analysis to address first. *Id.* at 236. All well-pleaded facts must be accepted as true and viewed in the light most favorable to the plaintiff. *Terwilliger*, 4 F.4th at 279.

To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In other words, "existing

precedent must have placed the statutory or constitutional question beyond debate." *Id.* The "clearly established" standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "reasonably anticipate when their conduct may give rise to liability for damages." *Id.* (cleaned up).

## C.  Rule (12)(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss an action for failure to state a claim on which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"These standards are the same when a motion to dismiss is based on qualified immunity." *Terwilliger*, 4 F.4th at 279-80. The crucial question is "whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983 . . . and would overcome their qualified immunity defense." *Id.* at 280. The plaintiff has the burden to demonstrate that qualified immunity is inappropriate. *Id.*

In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is generally limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019). Judicial notice may be taken of matters of public record. *Id.*

## V.   Individual Defendants' Partial Motion to Dismiss

Chief Mannix and Detective Dailey generally argue that they are entitled to qualified immunity as to Kelley's claims of fraudulent investigation, withholding and/or destroying material evidence, fabricating inculpatory evidence, failure to pursue known and exculpatory leads, and conspiracy.[15] In addition, Mannix and Dailey make the following specific arguments for dismissal: (1) Kelley has failed to plead sufficient facts to meet the heightened pleading standard for claims subject to the defense of qualified immunity; (2) Kelley's claims that amount to "unreasonable investigation" do not exist under federal law; (3) the independent intermediary doctrine precludes Kelley's Fourth Amendment claims; and (4) Kelley fails to state a claim under the Fifth and Fourteenth Amendments. Dkt. 39 at 9, 16.

To overcome the affirmative defense of qualified immunity, Kelley must allege sufficient facts (1) that the defendants violated a constitutional right, and (2) that the right at issue was "clearly established" at the time of defendants' alleged misconduct. *Pearson*, 555 U.S. at 232.

### A.  Objections to Exhibits

Dailey and Mannix object to three exhibits Kelley attached to his Response to the Motion to Dismiss: Dailey's probable cause affidavit charging Kelley with aggravated sexual assault of a child (H.M.) (Exh. 48-1); Dailey's probable cause affidavit charging Kelley with indecency with a child (L.M.) by sexual contact (Exh. 48-2); and a summary of Kelley's "Facts of the Case as Pled" (Exh. 48-3, 49-3). *See* Dkt. 52 at 3.

---

[15] Mannix and Dailey do not move to dismiss Kelley's unlawful seizure, *Brady*, and defamation claims. *See* Dkt. 39 at 4 & n.18. While Mannix and Dailey also move to dismiss Kelley's failure to properly train and supervise claim, Kelley has asserted that claim only against the City. *See* Dkt. 37 at 37 ("For his cause of action against the City of Cedar Park in Count VI, Plaintiff states . . . ."). Accordingly, the Court need not address Mannix and Dailey's arguments as to that claim.

As stated above, in determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, courts generally are limited to looking at the facts set forth in the complaint and documents attached to the complaint. *Walker*, 938 F.3d at 735. A court also may consider attachments to briefs regarding a motion to dismiss if the documents are referenced in the complaint, central to the complaint, or referenced by the parties, and their authenticity is not in dispute. *Walch v. Adjutant Gen.'s Dep't of Texas*, 533 F.3d 289, 294 (5th Cir. 2008). Courts also are permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss. *Walker*, 938 F.3d at 735.

The two probable cause affidavits and corresponding arrest warrants are mentioned in the Second Amended Complaint and central to the claims in this case. Both parties refer to these documents, and there is no dispute as to their authenticity. Accordingly, the Court may consider these exhibits in ruling on the motion to dismiss. *See Spease v. Cooper*, No. 1:12-CV-371, 2014 WL 526142, at *3 n.7 (E.D. Tex. Feb. 4, 2014) (considering arrest warrants on motion to dismiss which were referenced in complaint and matters of public record). The Court agrees with Defendants that the "Facts of the Case as Pled" summary should not be considered in the 12(b)(6) analysis. Accordingly, the Court **STRIKES** from the record Exhibits 48-3 and 49-3.

## B. Heightened Pleading Standard

Dailey and Mannix first argue that the majority of Kelley's claims should be dismissed because he has failed to plead sufficient facts to meet the Fifth Circuit's "heightened pleading requirement for claims subject to the defense of Qualified Immunity." Dkt. 39 at 5. In support of this argument, Dailey and Mannix cite to an unpublished case from the Northern District of Texas. *Bonner v. Alford*, No. 3:10-CV-2556-N BF, 2014 WL 285139, at *2 (N.D. Tex. Jan. 27, 2014) ("Where, as here, a defendant seeks dismissal based on qualified immunity, the complaint is subject to a heightened pleading requirement."), *aff'd*, 594 F. App'x 266 (5th Cir. 2015).

Subsequent precedent from the Fifth Circuit Court of Appeals is contrary to *Bonner*. In *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020), the court unequivocally stated that "an assertion of qualified immunity in a defendant's answer or motion to dismiss does not subject the complaint to a heightened pleading standard." Rather, "Section 1983 claims implicating qualified immunity are subject to the same Rule 8 pleading standard set forth in *Twombly* and *Iqbal* as all other claims." *Id.* A plaintiff's complaint need not

> exceed the short-and-plain-statement standard of Rule 8. Rather, "a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." That is, a plaintiff must plead qualified-immunity facts with the minimal specificity that would satisfy *Twombly* and *Iqbal*.

*Id.* (citations omitted). Accordingly, the Court recommends that this argument be denied.

## C. Fraudulent Investigation Claim

In Count I of his Second Amended Complaint, Kelley alleges that "Defendants' fraudulent investigation and unlawful seizure of Plaintiff by arrest, detention, prosecution, conviction and incarceration violated the procedural and substantive rights guaranteed to Plaintiff by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution." Dkt. 37 at 25. Dailey and Mannix argue that "Kelley's claims that amount to an 'unreasonable investigation' simply do not exist under federal law, and thus cannot constitute claims for which relief may be granted." Dkt. 39 at 9.

In *Shields v. Twiss*, 389 F.3d 142 (5th Cir. 2004), an arrestee filed a Section 1983 lawsuit against county officials after the county dropped charges against him for aggravated sexual assault of a child. The plaintiff argued that the police had failed to conduct an appropriate investigation, which would have revealed his innocence. The plaintiff asserted claims of unreasonable arrest and detention, malicious prosecution, and failure to conduct a reasonable investigation. The district

court granted the county officials' motion for summary judgment, finding that the plaintiff had not presented sufficient facts to show that the county officials withheld information from the grand jury, as required to show an absence of probable cause. *Id.* at 146. The Fifth Circuit affirmed, finding that the plaintiff "has put forward no evidence whatsoever that exculpatory information was withheld from the grand jury." *Id.* at 149. The Fifth Circuit also affirmed summary judgment on the plaintiff's "unreasonable investigation" claim, finding that the plaintiff "has pointed to no legal basis for a § 1983 of this sort, and the court knows of none." *Id.* at 150-51. Dailey and Mannix rely on this statement to argue that Kelley's claims "that amount to 'unreasonable investigation' simply do not exist under federal law, and thus cannot constitute claims for which relief may be granted." Dkt. 39 at 9. This argument is misplaced.

Kelley does not bring a standalone "unreasonable investigation" claim. Instead, he asserts that Dailey and Mannix's "fraudulent investigation and unlawful seizure of Plaintiff by arrest, detention, prosecution, conviction and incarceration violated the procedural and substantive rights guaranteed to Plaintiff by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution." Dkt. 37 at 25. Thus, unlike the plaintiff in *Shields*, Kelley does not merely assert a claim of unreasonable investigation; his claims regarding "fraudulent" investigation are connected with his unlawful seizure claim and therefore cognizable under the Fourth Amendment.[16]

The Fifth Circuit has held that "although there is no 'freestanding constitutional right to be free from malicious prosecution, the initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the

---

[16] Dailey and Mannix also argue that Kelley's allegations fail to support a claim for malicious prosecution. Dkt. 39 at 9. Kelley, however, does not allege an independent malicious prosecution claim. Moreover, "there is no freestanding right under the Constitution to be free from malicious prosecution." *Arnold*, 979 F.3d at 270. Facts amounting to malicious prosecution are properly evaluated under the Fourth Amendment. *Id.* Thus, the Court need not address this argument.

accused is seized and arrested, for example.'" *Winfrey v. Rogers*, 901 F.3d 483, 491 (5th Cir. 2018) (quoting *Castellano v. Fragozo*, 352 F.3d 939, 945, 953 (5th Cir. 2003) (en banc)), *cert. denied*, 139 S. Ct. 1549 (2019).[17] "The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial." *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). As the Fifth Circuit explained in *Winfrey*, where a fraudulent or malicious investigation also constitutes an illegal seizure, a "claim fits the Fourth Amendment, and the Fourth Amendment fits the plaintiff's claim, as hand in glove." 901 F.3d at 4992 (quoting *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917 (2017)). Kelley's claims of fraudulent investigation are properly evaluated under the Fourth Amendment.

Kelley's related claims of unlawful seizure, fabricating inculpatory evidence, and withholding exculpatory evidence also are properly evaluated under the Fourth Amendment. *Manuel*, 137 S. Ct. at 917 (finding that a pretrial detainee stated a Fourth Amendment claim where he was arrested and charged with unlawful possession of controlled substance based on false reports written by police officer); *Winfrey*, 901 F.3d at 492 (finding that Fourth Amendment was appropriate constitutional basis for plaintiff's claim he was wrongfully arrested due to knowing or reckless misstatements and omissions in sheriff's probable cause affidavits).[18]

---

[17] *See also Harris v. Mamou Police Dep't*, No. 6:18-CV-01024, 2019 WL 4200600, at *8 (W.D. La. Sept. 3, 2019) ("Although the Fifth Circuit has recognized that there is no independent claim for an unreasonable investigation, there may be circumstances under which investigatory conduct amounts to an independent violation of a specific constitutional guarantee, such as an investigation that results in a wrongful arrest or false imprisonment in violation of the Fourth Amendment.").

[18] Because Kelley's claims of fraudulent investigation and fabricating inculpatory evidence are properly evaluated under the Fourth Amendment, Kelley's argument that such claims fail to meet Rule 9(b)'s particularity requirements is misplaced. The Court nonetheless finds that these allegations in the Second Amended Complaint satisfy the requirements of Rule 9(b).

### D. Fourth Amendment Claims

The crux of Kelley's Fourth Amendment claims is that Mannix and Dailey fabricated and withheld material evidence in their affidavits. Dailey and Mannix argue that they are entitled to qualified immunity from these claims because there was probable cause for Kelley's arrest and, even if there was not, the independent intermediary doctrine precludes his claims.

### 1. Fourth Amendment and *Franks*

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend IV. The Fourth Amendment prohibits government officials from detaining or arresting a person "in the absence of probable cause." *Manuel*, 137 S. Ct. at 918. "Probable cause exists when all of the facts known by a police officer 'are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.'" *Villarreal v. City of Laredo, Tex.*, 17 F.4th 532, 543 (5th Cir. 2021) (quoting *Texas v. Kleinert*, 855 F.3d 305, 316 (5th Cir. 2017)). While law enforcement personnel "may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause." *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003) (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1217 (5th Cir. 1988)).

Under the independent intermediary doctrine, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Mayfield v. Currie*, 976 F.3d 482, 486 (5th Cir. 2020). But that shield from liability is not absolute. Relevant here, under *Franks v. Delaware*, 438 U.S. 154 (1978), and its progeny, "officers who deliberately or recklessly provide

25

false, material information for use in an affidavit or who make knowing and intentional omissions that result in a warrant being issued without probable cause may still be held liable." *Mayfield*, 976 F.3d at 487 (cleaned up). Liability under *Franks* can arise from either material misstatements or material omissions in warrant affidavits. *Terwilliger*, 4 F.4th at 281.

Since *Franks,* "it has been clearly established that a defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes 'a false statement knowingly and intentionally, or with reckless disregard for the truth' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *Winfrey*, 901 F.3d at 494 (quoting *Franks*, 438 at 155-56). Courts look to whether "'there remains sufficient content in the warrant affidavit to support a finding of probable cause' *after* the 'material that is the subject of the alleged falsity or reckless disregard is set to one side.'" *Terwilliger*, 4 F.4th at 281 (quoting *Franks*, 438 U.S. at 171-72). The Court applies these factors to each defendant separately.[19]

## 2.  Application of *Franks* to Detective Dailey

Under the first prong of *Franks*, Kelley must allege that Dailey, through material omissions or otherwise, made "a false statement knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155.  Kelley alleges that Dailey made the following false statements in his probable cause affidavit as to H.M.: (1) Kelley committed the offense against H.M. while he lived at the McCarty house "on or about December A.D. 2012 to June A.D., 2013," despite the fact that H.M.'s parents, Officer Freed, and the Children's Advocacy Center reported the offense date as July 12, 2013, after Kelley moved out; (2) H.M. made an outcry to H.M.'s mother that "the Defendant put his penis in the Victim's mouth on two occasions" during this time period at the

---

[19] Although Kelley mentions *Franks* and *Winfrey* in his Response, Dailey and Mannix do not address either holding in their Reply. Instead, Dailey and Mannix argue that the Fifth Circuit's decisions in *Shields* and *Shaw v. Villanueva,* 918 F.3d 414 (5th Cir. 2019), are fatal to Kelley's claims. The facts in each of those cases are readily distinguishable from the present case.

McCarty house; and (3) H.M. made an outcry to the Children's Advocacy Center that "the Defendant" had committed the offense. Dkt. 49-1. Kelley further alleges that Dailey never disclosed to the magistrate that (1) H.M. never identified the assailant "Greg" as being the same person as Greg Kelley; (2) Kelley was not living at the McCarty house at the time of the accusations; (3) Dailey never interviewed Kelley; and (4) Dailey never visited the McCarty house or interviewed any of the male residents living there at the time of the accusations.

Kelley alleges that Dailey made similar false statements and omissions regarding the probable cause affidavit as to L.M. Kelley alleges that Dailey falsely stated that (1) Kelley committed the offense against L.M. when Kelley lived at the McCarty house between "June 2012 and June 2013;" (2) L.M. made outcries to his parents and Dailey "that the Defendant made the Victim rub lotion on the Defendant's penis;" and (3) Defendant had been charged with sexually assaulting another four-year-old boy "at the same address during the same time period." Dkt. 49-2. Kelley further alleges that Dailey failed to disclose to the magistrate that L.M. also had accused "Johnathan" and that L.M. did not make an outcry during his first two interviews at the Children's Advocacy Center.

The Court finds that these allegations constitute materially false statements or omissions in the probable cause affidavits. *See Terwilliger*, 4 F.4th at 283 (finding that plaintiffs sufficiently alleged defendants deliberately excluded relevant information that would have weighed against individualized probable cause); *Winfrey*, 901 F.3d at 494 (finding that plaintiff presented sufficient evidence to create a fact issue as to whether officer made material false statements in his affidavit).

The Court also finds that Kelley has alleged sufficient facts that Dailey made false statements intentionally or with reckless disregard for the truth to withstand *Iqbal/Twombly*. While Dailey denies that he intentionally backdated the offense date used in the affidavits, which was "the creation of a reasoned deduction based on evidence," Dkt. 39 at 16, Kelley has alleged sufficient

facts to allege a plausible claim that Dailey either intentionally made numerous false statements in the affidavits or at the very least made them with reckless disregard for the truth. This includes the fact that H.M.'s parents told the police and Children's Advocacy Center that the offense against their son happened on July 13, 2003.

Under the second prong of *Franks*, the Court must determine whether, excluding such errors and omissions, the remaining "corrected affidavit" establishes probable cause for the warrant. *Terwilliger*, 4 F.4th at 283. Weighing the totality of the circumstances, the Court finds that a reasonable magistrate would not have issued the warrants based on corrected affidavits including the omitted material facts that Kelley did not live at the McCarty house at the time of the alleged offenses, H.M. and L.M. never identified Kelley, and L.M. mentioned another assailant named Johnathan in his outcries. *See Winfrey*, 901 F.4th at 496 (holding that magistrate would not have issued arrest warrant based on corrected affidavit including reference to omitted material facts).

Taking Kelley's allegations as true and viewing them in the light most favorable to Kelley, as the Court must at the 12(b)(6) stage of this proceeding, the Court concludes that the Second Amended Complaint sufficiently alleges a plausible *Franks* violation against Dailey. *See Terwilliger*, 4 F.4th at 283.

### 3. *Franks* Liability as to Chief Mannix

In the Fifth Circuit, a law enforcement officer "must have assisted in the preparation of, or otherwise presented or signed a warrant application in order to be subject to liability under *Franks*." *Id.* (quoting *Melton v. Phillips*, 875 F.3d 256, 263 (5th Cir. 2017)). If an officer does not present or sign the affidavit, liability attaches only if "he helped prepare the complaint by providing information for use in it." *Id.*

Mannix neither signed nor swore to the affidavits here. However, Kelley alleges that Dailey "assumed control and directed" the investigation, Dkt. 37 ¶ 27, and that Dailey and Mannix

knowingly and intentionally "ignored, withheld, destroyed, and fabricated evidence in order to secure Plaintiff's conviction." *Id.* ¶¶ 20, 106. Kelley further alleges that: "The defendants knew by their training that by withholding the foregoing information from the magistrate, they were violating Plaintiff's rights to a fair investigation." *Id.* ¶ 30. Taken in the light most favorable to his claim, Kelley has alleged that Mannix knowingly or with reckless disregard supplied false or materially misleading information to the magistrate. *See Terwilliger*, 4 F.4th at 284 (finding that plaintiff alleged *Franks* claim against detective alleged to have supplied false or misleading information used in probable cause affidavits). Accordingly, Kelley has alleged a plausible *Franks* claim against Mannix.

In sum, Kelley has sufficiently stated his Fourth Amendment claims based on fraudulent investigation and unlawful seizure, the withholding and/or destroying of exculpatory evidence, and the fabrication of inculpatory evidence.

### E. Fourteenth Amendment Claims

Kelley alleges that Defendants' fraudulent investigation and unlawful seizure, the withholding of exculpatory evidence, and the fabrication of inculpatory evidence also violated his procedural and substantive due process rights under the Fourteenth Amendment. Kelley fails to state a claim for a violation of substantive due process "because resort to a generalized remedy under the Due Process Clause is inappropriate where a more specific constitutional provision provides the rights at issue." *Arnolds*, 979 F.3d at 270. "In those situations, the specific provision, 'not the more generalized notion of 'substantive due process,' better guides analysis of a plaintiff's claims." *Id.* (quoting *Albright*, 510 U.S. at 273). In *Albright*, the Supreme Court stated that "the Fourth Amendment remained the 'relevant' constitutional provision to assess the 'deprivations of liberty'—most notably, pretrial detention—'that go hand in hand with criminal prosecutions.'" *Manuel*, 137 S. Ct. at 918 (quoting *Albright*, 510 U.S. at 274).

Kelley's rights are protected by the unreasonable seizure clause of the Fourth Amendment and the due process clause of the Fourteenth Amendment. *Id.* at 919 ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment," not in the due process clause). Kelley has not stated a claim under the substantive due process clause of the Fourteenth Amendment. *Arnold*, 979 F.3d at 270.

Mannix and Daily also contend that, with the exception of his *Brady* claim, Kelley's procedural due process claims under the Fourteenth Amendment fail because those claims are covered by the Fourth Amendment. To the contrary, it is well established "that a conviction obtained through use of false evidence, known to be such by representatives of the State," violates a defendant's due process rights under the Fourteenth Amendment. *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). Similarly, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Kelley's claims of withholding and/or destroying material exculpatory evidence and fabricating inculpatory evidence also invoke the Fourteenth Amendment's due process clause.

## F. Fifth Amendment Claims

Kelley also asserts a Fifth Amendment due process claim against the Defendants. The due process clause of the Fifth Amendment applies only to actions of the federal government. *See Arnold*, 979 F.3d at 270 (holding that plaintiff failed to state claim under Fifth Amendment due process clause because defendant "was an officer of the state of Louisiana rather than of the federal government"); *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996) (stating that "the Fifth Amendment applies only to the actions of the federal government, and not to the actions of a municipal

government"). Because Dailey and Mannix are not federal officials, Kelley's Fifth Amendment claims should be dismissed.

## G. Conspiracy Claim

In addition, Kelley alleges that Dailey, Mannix, and the City engaged in a conspiracy "among and between themselves and others" to violate his constitutional rights. In order to allege a plausible conspiracy claim under Section 1983, a plaintiff must allege facts that show (1) an agreement between private and public defendants to commit an illegal act, and (2) an actual deprivation of constitutional rights. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). "[M]ere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy under 42 U.S.C. § 1983." *Brinkmann v. Johnston*, 793 F.2d 111, 113 (5th Cir. 1986).

In his Second Amended Complaint, Kelley alleges no facts that the City conspired through its officials with any non-city individuals. "[I]t is elementary that an entity cannot conspire with itself." *Burns v. Harris Cnty. Bail Bond Bd.*, 139 F.3d 513, 520 (5th Cir. 1998). Accordingly, this claim should be dismissed.

Kelley argues that Texas Residential Child Care Licensing investigator Heather Bradley conspired with the Defendants by permitting Dailey to interview L.M. and deleting emails. Dkt. 49 at 19. These allegations are not in Kelley's Second Amended Complaint. See Dkt. 37 ¶¶ 153-57. Moreover, conclusory allegations that do not reference specific factual allegations tending to show an agreement are insufficient to state a civil rights conspiracy claim under Section 1983. *Priester v. Lowndes Cnty.*, 354 F.3d 414, 420 (5th Cir. 2004) (upholding Rule 12(b)(6) dismissal because complaint did not allege "specific facts" to show agreement); *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982) (finding that plaintiff's conclusory allegations of conspiracy failed to allege

sufficient facts to show "that the defendants agreed to commit an illegal act"). Kelley's conspiracy claim does not state a plausible claim for relief.

## H.  Conclusion as to Chief Mannix and Detective Dailey's Partial Motion to Dismiss

Taking Kelley's allegations as true and viewing them in the light most favorable to Kelley, as the Court must at this stage of the proceeding, the Court concludes that the Second Amended Complaint sufficiently alleges that (1) Mannix and Dailey violated his Fourth and Fourteenth Amendment rights, and (2) the rights at issue were "clearly established" at the time of defendants' alleged misconduct. *Pearson*, 555 U.S. at 232. Accordingly, Kelley has met his burden to show that Dailey and Mannix are not entitled to qualified immunity with regard to his Fourth and Fourteenth Amendment claims.

## VI.    City of Cedar Park's Motion to Dismiss

Kelley alleges that the City failed to properly train and supervise its police officers, which led to the violation of his constitutional rights. Specifically, Kelley alleges that Dailey's supervisors, including Mannix, failed to adequately train and supervise Dailey and others employed by the City with respect to fundamental investigative techniques and duties, which led to violations of Kelley's constitutional rights.

The City argues that all of Kelley's claims should be dismissed because he has failed to plead facts sufficient to show that the City is liable under the Supreme Court's decision in *Monell*, 436 U.S. at 694-95. The City further argues that Kelley's conspiracy, substantive due process, and Fifth Amendment claims fail to state a claim. Finally, the City asks the Court to disregard new claims and allegations in Kelley's Second Amended Complaint.

## A.  Conspiracy, Substantive Due Process, and Fifth Amendment Claims

For the same reasons discussed above with regard to the individual defendants, Kelley has not stated a plausible claim for relief under the substantive due process clause or the Fifth Amendment

or a conspiracy claim under Section 1983. The undersigned Magistrate Judge recommends that these claims be dismissed.

## B.  Alleged New Claims

On February 9, 2021, the parties filed an "Agreed Motion to Dismiss Certain Allegations of Plaintiff's First Amended Complaint," in which they asked the Court to dismiss allegations of defamation, punitive damages as to the City and Detective Dailey, and indemnification in Kelley's First Amended Complaint (Dkt. 19). Dkt. 33. On February 11, 2021, the District Court granted the motion and dismissed those allegations. Dkt. 35. Kelley filed his Second Amended Complaint on February 26, 2021. Dkt. 37.

The City now argues that Kelley's Second Amended Complaint violates the parties' Agreed Motion and the District Court's "direct instructions by expanding his complaint with new, baseless and conclusory assertions." Dkt. 51 at 2. Kelley asks the Court "to disregard the new and baseless arguments and allegations that have been added to what was already an excessive pleading." Dkt. 38 at 2.

The Court finds that Kelley's Second Amended Complaint does not violate the Agreed Motion or the District Court's Order. Despite the City's arguments, Kelley has not added any new claims to the Second Amended Complaint. Even if he had, the District Court's Order did not state that Kelley was not permitted to add allegations or claims. Dkt. 35. Accordingly, the Court **DENIES** the City's request to ignore allegations properly asserted in the Second Amended Complaint.

## C.  Municipal Liability under Section 1983

A municipality or other local government may be liable under Section 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692). But under Section 1983, municipalities are responsible only for "their *own* illegal

acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986). Thus, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

In order to state a plausible claim against a municipality under *Monell* and its progeny, a plaintiff must plead (1) a policymaker, (2) an official policy or custom, and (3) a violation of a constitutional right whose "moving force" is the policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). These three requirements "are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Id.* A plaintiff need not offer proof of his allegations at this stage, but still must plead facts that plausibly support each element. *Iqbal*, 556 U.S. at 678.

### 1. Policymaker

A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010). Identification of an official as a final policymaking authority is a question of state and local law. *Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir.), *cert. denied*, 140 S. Ct. 651 (2019).

Kelley identifies Mannix, the CPPD Chief of Police, as the City policymaker during his arrest and prosecution and cite authority for that proposition. The Fifth Circuit has found repeatedly that "Texas police chiefs are final policymakers for their municipalities," *Id.* (collecting cases). Accordingly, Kelley has met the first element of *Monell*.

### 2. Policy or Custom

Next, the Court must determine whether the allegedly unconstitutional action constitutes a policy or custom of the municipality. There are several ways to establish a municipal policy for the purpose of establishing a municipal's liability under *Monell*. First, a plaintiff can show a policy arising from written policy statements, ordinances, or regulations. *Piotrowski*, 237 F.3d at 579. Second, a plaintiff can show a policy by a custom, that is, "a persistent, widespread practice of

City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* Third, a "single decision" may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim." *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019) (citing *Pembaur*, 475 U.S. at 480-81). Finally, a municipality's decision not to train or supervise its employees about their legal duty to avoid violating citizens' rights may rise to the level of an official policy for purposes of Section 1983. *Connick*, 563 U.S. at 61; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989).

Whatever its form, to yield municipal liability under § 1983, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F. 3d at 580 (quoting *Monell*, 436 U.S. at 694). "In other words, a plaintiff must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009).

It is unclear on which policy theory Kelley relies. His Second Amended Complaint invokes the custom and failure to train and supervise theory. In his Response brief, Kelley states that he is abandoning his failure to train theory but still pursuing his failure to supervise theory. Dkt. 49 at 16. His Response, however, appears to invoke the single decision theory. *Id.* at 17. Finally, in his Sur-Reply, Kelley states that he "does not rely upon a single incident to establish custom, policy or practice," but then appears to argue that the single decision theory applies. Dkt. 55-1 at 3.[20] Thus, Kelley now seems to assert only a failure to supervise policy theory.

---

[20] The Court acknowledges that the single decision/incident discussion also comes into play under the deliberate indifference requirement of a failure to supervise theory.

When a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes "official policy" that can support municipal liability if it "amounts to deliberate indifference." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *Canton*, 489 U.S. at 388). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). When a municipality's policymakers are on actual or constructive notice that a particular omission in their training program causes municipal employees to violate citizens' constitutional rights, the municipality may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*

Deliberate indifference may be established in two ways. First, deliberate indifference generally requires that the plaintiff demonstrate "at least a pattern of similar violations" arising from training that is so clearly inadequate as to be "obviously likely to result in a constitutional violation." *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003). Second, deliberate indifference can be shown "in a limited set of cases" by "showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights." *Id.* at 372.

Kelley relies on both theories. First, he argues that the City has had at least a "decade long pattern" of "police violations of the rights of criminal suspects." Dkt. 49 at 17. In support of this argument, Kelley identifies four defendants who also allegedly were falsely accused of crimes by the CPPD. Dkt. 37 ¶ 87. As the City points out, however, all but one of these cases were initiated after Kelley was charged. Accordingly, Kelley has not alleged sufficient facts to show a pattern of similar violations.

The Court finds, however, that Kelley's allegations are sufficient at the Rule 12(b)(6) stage to fall within the single incident exception. Under certain circumstances, Section 1983 liability "can attach for a single decision not to [supervise] an individual officer even where there has been no pattern of previous constitutional violations." *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 459 (5th Cir. 2000). The single incident exception is a narrow one, and will apply "only where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to [supervise]." *Burge*, 336 F.3d at 370.

In his Second Amended Complaint, Kelley alleges that Dailey's supervisors, including Mannix, failed to adequately train and supervise Dailey and others employed by the City

> with respect to fundamental investigative techniques and duties, including the duty to avoid coaching witnesses, the duty to disclose manipulation of witness recollections, the duty to maintain all emails relating to an investigation, the duty to disclose material exculpatory evidence to prosecutors and defense counsel, the duty of candor to the Court and proper methods of securing evidence, of locating suspects and of following exculpatory leads.

Dkt. 37 ¶ 160. Kelley further alleges that:

> The lack of proper supervision over Defendant Detective Dailey resulted in overt acts and omissions including the wrongful arrest, prosecution, conviction, and imprisonment of Plaintiff. They also included the manufacture of knowingly false and knowingly unreliable evidence which was intended to inculpate Plaintiff; the suppression of exculpatory evidence; intentional failure to investigate evidence which would have exculpated Plaintiff; and the filing of false, misleading, and unreliable reports as a part of the investigation of the reported assault.

*Id.* ¶ 161. In addition, Kelley alleges that:

- Mannix did not have any specific written criminal investigation procedures or policies for the investigation of crimes, and Mannix and the City were deliberately indifferent to the consequence of their failure to create and enforce consistent investigation

standards that were nationally recognized and readily available to guide and govern the work of detectives in conducting investigations. *Id.* ¶¶ 162-63.

- After Dailey's misconduct was revealed in the Habeas proceedings, Mannix failed to discipline Dailey and instead rewarded his performance with a promotion. *Id.* ¶ 162.

- Mannix stated that the investigation was conducted "in accordance with Cedar Park Police Department Policy," and that "Detective Dailey did not violate his policy and that Detective Dailey did not violate 'the law.'" *Id.* ¶ 71.

- Mannix "has expressed his feelings about 'due process,'" by stating: "It's nonsense about this due process issue. It's a standard in law that doesn't exist." *Id.* ¶ 72.

The Court finds these allegations sufficient to show that "it should have been apparent" to Mannix that a constitutional violation was "the highly predictable consequence" of his failure to supervise Dailey in criminal investigations. *Burge*, 336 F.3d at 370. Whether Kelley's supervision claim withstands a motion for summary judgment or prevails at trial, his allegations are sufficient to state a claim under Rule 12(b)(6). *See Covington v. City of Madisonville, Texas*, 812 F. App'x 219, 227-28 (5th Cir. 2020) (holding that plaintiff sufficiently stated failure to supervise claim against city at motion to dismiss stage arising from unlawful arrest and consequent temporary loss of child custody when police officer, arrestee's ex-husband, planted methamphetamine underneath her vehicle and police chief did nothing to determine validity of reports that evidence was planted).

### 3. Causation

Under the final *Monell* factor, a plaintiff must show that a policy was the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 578. Asserting an actionable failure to supervise municipality claim requires a "direct causal link" between the policy and the asserted violation. *Covington*, 812 F. App'x at 227. Construing Kelley's allegations in his favor,

had Mannix required his detectives to perform adequate investigations and sufficiently supervised his staff, a reasonable inference can be drawn that Kelley's arrest, criminal charges, and conviction would not have occurred. *See id.* at 228 (finding that plaintiff's allegations that police chief ignored investigation and complaints about it were sufficient to show causal connection).

**4.  Conclusion as to Municipal Liability under Section 1983**

Based on the foregoing, Kelley has stated a *Monell* claim against the City.

## VII.    Leave to Amend

In his Response, Kelley seeks leave to file a third amended complaint if the Court finds any of his claims deficient. Dkt. 49 at 20. Courts should freely grant leave to amend when justice so requires. FED. R. CIV. P. 15(a)(2). Courts should deny leave to amend when amendment would cause undue delay or undue prejudice to the opposing party, or the amendment would be futile or in bad faith. *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Amendment is futile where it "would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872-73 (5th Cir. 2000).

The Court finds that any amendment would be futile because Kelley's Fifth Amendment, substantive due process, and conspiracy claims fail as a matter of law. *Onabajo v. Household Fin. Corp. III,* No. 1:18-CV-233-LY, 2019 WL 2565247, at *1 (W.D. Tex. Mar. 26, 2019) (finding that any attempt to amend would be futile, "as the allegations asserted in Plaintiffs' proposed third amended complaint do not remedy the fact that Plaintiffs' claims fail as a matter of law"), *aff'd*, 795 F. App'x 258 (5th Cir. 2020). Kelley already has had two opportunities to amend his complaint after Defendants filed motions to dismiss. Thus, Kelley has pled his "best case." *See Baldwin v. Sullivan*, No. 1:18-CV-36-RP, 2018 WL 5020028, at *7 (W.D. Tex. Oct. 15, 2018) (stating that plaintiff has pleaded her best case after she is "apprised of the insufficiency" of her complaint) (citing *Morrison v. City of Baton Rouge*, 761 F.2d 242, 246 (5th Cir. 1985)). The Court further

finds that any amendment would cause undue delay, given that this case has been pending since May 5, 2020. Accordingly, Kelley's request for leave to amend his Second Amended Complaint should be denied.

### VIII.    Order and Recommendation

The Court **STRIKES** from the record Plaintiff's Exhibits 48-3 and 49-3 (Plaintiff's "Facts of the Case") attached to his Response briefs.

The undersigned **RECOMMENDS** that the District Court **GRANT IN PART AND DENY IN PART** Defendant City of Cedar Park's Motion to Dismiss (Dkt. 38) and Defendants Sean Mannix and Christopher Dailey's Partial Motion to Dismiss (Dkt. 39). The Court **RECOMMENDS** the District Court **GRANT** the Motions to Dismiss with regard to Plaintiff's Fifth Amendment claims, substantive due process claims under the Fourteenth Amendment, conspiracy claims under Section 1983 against all Defendants, and Plaintiff's failure to train claim against the City, and otherwise **DENY** the Motions to Dismiss.

If the District Court adopts this Report and Recommendation, the following claims will remain: Plaintiff's Fourth Amendment and Fourteenth Amendment procedural due process claims against all Defendants (Counts 1-IV); Plaintiff's *Monell* claim based on a failure to supervise against the City (part of Count VI); Plaintiff's defamation claim against Chief Mannix (Count VII); and Plaintiff's claim for damages (Count VIII).

The Court **FURTHER RECOMMENDS** that the District Court **DENY** Kelley's request for leave to file a Third Amended Complaint.

It is **ORDERED** that the Clerk remove this case from the Magistrate Court's docket and **RETURN** it to the docket of the Honorable Robert Pitman.

### IX.    Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on February 3, 2022.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE